Filed 3/29/24  In re C.B. CA4/2

*See dissenting opinion.*

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re C.B., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E082124 |
| Plaintiff and Respondent, | (Super.Ct.No. J282175) |
| v. | OPINION |
| T.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Mansi Thakkar, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Tom Bunton, County Counsel, Landon Villavaso, Deputy County Counsel for Plaintiff and Respondent.

Defendant and appellant T.G. (Mother) and D.B.[1] (Father) are the parents of C.B. (female, born May 2011; Minor).  Mother appeals from the juvenile court's finding that the Indian Child Welfare Act of 1978[2] (ICWA) did not apply to Minor.  For the reasons set forth *post*, we affirm the juvenile court's orders and findings.

## FACTUAL AND PROCEDURAL HISTORY[3]

On March 29, 2019, San Bernardino County Children and Family Services (Department) received a general neglect referral for Minor.  The referral alleged that Father was involved in another dependency proceeding involving Minor's half sibling, D.B.  In that case, the juvenile court terminated Father's reunification services because Father failed to drug test and to complete a substance abuse program.  As to Minor, the referral alleged that Mother's whereabouts were unknown and Minor had been living with Father and Minor's stepmother.  The family resided in the paternal grandparents' home.

---

[1] Father is not a party to this appeal.

[2] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

[3] We will concentrate on the facts and procedural history that pertain to ICWA.

Five months later, on August 23, 2019, a protective custody warrant was executed on behalf of Minor. Three days later, the Department filed a Welfare and Institutions Code section 300 petition.

At the detention hearing on August 26, 2019, Mother was not present. The juvenile court found that the Department had established a prima facie case that Minor came within section 300, detention was necessary, and Minor was detained.

On the same date, Father filed an ICWA-020 form, indicating that he "maybe" had "Blackfoot"[4] ancestry. Father also filed a "Family Find and ICWA Inquiry" form indicating that his knowledge of Native American ancestry was unknown. He, however, noted that he may have Blackfoot ancestry. At the hearing, when questioned by the juvenile court, Father stated he had no Indian ancestry.

In the Family Find and ICWA Inquiry form, Father listed contact information for the following relatives: paternal aunt B.J., paternal grandfather (A.B.), and paternal grandmother (Y.B.). When questioned about this information, Father also provided Y.B.'s maiden name, date of birth, and place of birth. Moreover, Father provided the name of Minor's paternal great-grandmother, W.B.; her date or place of birth was unknown. It was later reported that when the Department interviewed the paternal grandparents, they reported having Cherokee and Blackfoot Indian ancestry.

---

[4] We place "Blackfoot" in quotation marks because "there is frequently confusion between the Blackfeet tribe, which is federally recognized, and the related Blackfoot tribe which is found in Canada and thus not entitled to notice of dependency proceedings." (*In re L.S* (2014) 230 Cal.App.4th 1183, 1198.)

On August 26, 2019, B.J. filed a Family Find and ICWA Inquiry form. B.J. provided that she had Cherokee Indian ancestry in the Oklahoma Tribe, and Blackfoot Indian ancestry in the "Kentucky/Tennessee" Tribe. When the Department followed up with B.J. regarding her claim of Indian ancestry, B.J. denied having any tribal affiliation. When a second paternal aunt was questioned, she also denied having any Indian tribal affiliation.

On August 26, 2019, the paternal stepmother filed a Family Find and ICWA Inquiry form; she indicated having no Indian ancestry. When the Department contacted the paternal grandmother of Minor's half sibling, A.J., on November 10, 2020, she denied having any Indian ancestry. She has since passed away so the Department could not make further inquiries.

On September 13, 2019, the Department filed an ICWA declaration of due diligence. The declaration indicated the Department notified the following Indian tribes on August 28, 2019: the Blackfeet Tribe of Montana; the United Keetowah Band of Cherokee Indians in Oklahoma; the Bureau of Indian Affairs (BIA); the Eastern Band of Cherokee Indians; and the Cherokee Nation of Oklahoma. The Eastern Band of Cherokee Indians, the Blackfeet Tribe of Montana, the United Keetoowah Band of Cherokee Indians in Oklahoma, and the Cherokee Nation of Oklahoma wrote to the Department indicating that Minor was neither registered nor eligible for registration as a member. Moreover, all the tribes noticed indicated they would not intervene.

At the jurisdiction/disposition hearing on October 7, 2019, Mother was not present. The court found Father to be Minor's presumed father. The court granted Father

4

reunification services. The court did not grant services to Mother because her whereabouts were still unknown.

One year later, on October 7, 2020, at a section 366.21, subdivision (f), hearing, the juvenile court terminated Father's reunification services; Father failed to complete any aspect of his case plan.

In a status review report filed on March 15, 2023, the social worker stated that on February 15, 2023, the Department emailed the BIA with Minor's name and the names of Minor's family members. On February 21, 2023, the Department also informally noticed the Eastern Band of Cherokee Indians, the Cherokee Nation, the United Keetoowah Band of Cherokee Indians, and the Blackfoot Tribes. The Eastern Band of Cherokee Indians, the United Keetoowah Band of Cherokee Indians, the Cherokee Nation, and the Eastern Band of Cherokee Indians wrote back indicating that Minor was neither eligible nor recognized as a member of their tribes.

In an additional information to the court filed on June 15, 2023, the Department indicated that the Department social worker found a working phone number for Mother on May 17, 2023. The social worker and Mother spoke on May 30, 2023. When the social worker asked Mother about potential Indian ancestry on the maternal side of the family, Mother stated, " 'maybe my grandfather on my mom's side is Aztec. I am not sure though. I do not know how to say or spell his name. He passed away in 2000 but I will call my brother . . . and ask him.' " One day later, Mother called the social worker back indicating her brother told Mother the grandfather's name was Porfiri Velasquez. When the social worker asked for the brother's phone number, Mother "declined to give

5

it and said that he declined contact with the department." Thereafter, the social worker "reached out to ICWA liaison and was notified that the Aztec Tribe is not federally recognized and noticing is not required."

On May 30, the Department mailed another letter to the BIA regarding Father's claim of Cherokee and Blackfoot Indian ancestry. The following day, the Department again mailed letters to the Cherokee Nation, the Eastern Band of Cherokee Indians, the United Keetoowah Band of Cherokee Indians, and the Blackfoot Tribes; the names and dates of birth for Minor's family members were provided. The Eastern Band of Cherokee Indians, the United Keetoowah Band of Cherokee Indians, and the Cherokee Nation again provided that Minor was not eligible or recognized as a member of the tribe.

On July 17, 2023, the Department filed a section 366.26 report. In the report, the department recommended that both Mother's and Father's parental rights be terminated and a permanent plan of adoption be implemented for Minor.

In the report, the social worker provided that since Minor was removed, she had been in six different placements. However, Minor has been living in the preadoptive home of Mr. and Mrs. E. (foster parents) since November 2022. The foster parents wanted to adopt Minor, and Minor wanted to be adopted by the foster parents.

On July 24, 2023, Mother appeared in court for the first time. The court conducted an ICWA inquiry of Mother, and notified Mother that the proceeding was scheduled for a hearing on the termination of parental rights.

The section 366.26 hearing was held on September 13, 2023. Mother was present; Father was not present. Mother objected to the termination of her parental rights and

6

asked that legal guardianship be implemented instead. After finding Minor to be both generally and specifically adoptable, the juvenile court terminated the parental rights of both Mother and Father.

On September 13, 2023, Mother filed a timely Notice of appeal.

## DISCUSSION

### A. INITIAL INQUIRY UNDER ICWA

Mother contends that "the juvenile court committed prejudicial error by failing to ensure ICWA related initial inquiry of all available extended family members pursuant to sections 224.2, subds. (a)-(b), and its order terminating Mother's parental rights should be conditionally reversed." Mother argues that "[s]pecifically, the juvenile court failed to ensure ICWA inquiry of certain maternal relatives, the uncle [P.S.] and relative [S.G.], 'extended family member,' of whether [Minor] had Indian ancestry."

#### 1. *LEGAL BACKGROUND*

Under ICWA, the juvenile court and the Department have an "an 'affirmative and continuing duty to inquire' whether a child in a dependency proceeding 'is or may be an Indian child.' " (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 678, (*Ricky R.*), quoting § 224.2, subd. (a).) "The duty to inquire consists of two phases—the duty of initial inquiry and the duty of further inquiry." (*Ibid.*)

Initially, "[i]f a child is placed into the temporary custody of a county welfare department pursuant to Section 306 or county probation department pursuant to Section 307," then the county welfare department must ask the "child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and

7

the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) At the parties' first appearance before the juvenile court, the court must ask "each participant present in the hearing whether the participant knows or has *reason to know* that the child is an Indian child" (§ 224.2, subd. (c), italics added), and "[o]rder the parent . . . to complete *Parental Notification of Indian Status* ([Cal. Judicial Council] form ICWA-020)." (Cal. Rules of Court, rule 5.481(a)(2)(C).)

Thereafter, when there exists a *reason to believe* that an Indian child is involved, the social worker must "make further inquiry regarding the possible Indian status of the child." (§ 224.2, subd. (e).)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*In re D.S*. (2020) 46 Cal.App.5th 1041, 1051.)

2.      *ANALYSIS*

Under section 224.2, subdivision (b), "[i]f a child is placed into the temporary custody of a county welfare department pursuant to Section 306 or county probation department pursuant to Section 307," then the county welfare department must ask the "child, parents, legal guardian, Indian custodian, extended family members . . . whether the child is, or may be, an Indian child." (§ 224.2, subd. (b).)

8

Here, as provided *ante*, Minor was not "placed into the temporary custody of the county welfare department pursuant to section 306." (§ 224.2, subd. (b).) Instead, Minor was taken into protective custody via a protective custody warrant.

In *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743 (*Robert F.*), this court held that "[s]ubdivision (b) of section 224.2 requires a county welfare department to ask extended family members about a child's Indian status only if the department has taken the child into temporary custody under section 306." Thereafter, this court again held that "CFS must ask extended family members and others . . . only if that child has been placed into CFS's temporary custody pursuant to section 306." (*In re Ja.O.* (2023) 91 Cal.App.5th 672, 677-678, review granted July 26, 2023, S280572 (*Ja.O.*)) This court went on to state that "[t]he expanded duty of initial inquiry under subdivision (b) of section 224.2 [] does not apply" when a child is taken into protective custody pursuant to a warrant under section 340, subdivision (b). (*Ja.O.*, at p. 679.)

Another panel of this court, however, reached an opposite conclusion in *In re Delila D.* (2023) 93 Cal.App.5th 953, review granted September 27, 2023, S281447. In *Delila D.*, the majority disagreed with *Robert F.* and held that the agency's duty to inquire of extended family members applies in every dependency case, regardless of how the child is taken into custody—with or without a warrant. (*Delila D.*, at pp. 956-957.)

The California Supreme Court will resolve this split of authority when it issues its decision in *Ja.O.*, the lead case under review. (See *Ja.O.*, *supra*, 91 Cal.App.5th 672.)

In her brief, Mother argues that we should follow *In re Delila D.*, *supra*, and other cases that have agreed with *Delila D.* and "find that section 224.2, subd. (b) applies in the instant matter."

Notwithstanding Mother's argument, we agree with the interpretation of section 224.2, subdivision (b), as adopted and explained by this court in *Robert F.*, *supra*, 90 Cal.App.5th at p. 500-504, and *Ja.O.*, *supra*, 91 Cal.App.5th at pp. 677-681.)  In sum, section 224, subdivision (b) "requires a county welfare department to ask extended family members about a child's Indian status only if the department has taken the child into temporary custody under section 306," without a warrant.  (*Robert F.*, at p. 504.)

Therefore, because Minor was detained after the Department obtained a detention warrant, not under the authority of section 306, the expanded duty of initial inquiry under section 224.2, subdivision (b), does not apply.  There was no inquiry error under section 224.2, subdivision (b).

## A.     FURTHER INQUIRY UNDER ICWA

Mother contends that "the juvenile court also erred in terminating Mother's parental rights because it failed to ensure ICWA related further inquiry of the Blackfeet tribe pursuant to section 224.2, subdivision (e)."

### 1.     *LEGAL BACKGROUND*

Under section 224.2, subdivision (e), the duty of further inquiry is triggered if there is "reason to believe than an Indian child is involved in a proceeding."

The Legislature has defined "reason to believe" as having "information suggesting that either the parent of the child or the child is a member or may be eligible for

membership in an Indian tribe.  Information suggesting membership or eligibility for membership includes, *but is not limited to*, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)."  (§ 224.2, subd. (e)(1), italics added.)

Those enumerated grounds are as follows: "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child.  [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village.  [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child.  [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child.  [¶] (5) The court is informed that the child is or has been a ward of a tribal court.  [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d).)

When the "reason to believe" threshold is reached, the requisite further inquiry includes, but is not limited to, interviewing the parents and extended family members, contacting the BIA and State Department of Social Services for assistance in identifying the tribes in which the child may be a member or eligible for membership, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility.  (§ 224.2, subd. (e)(2)(A)-(C).)

11

As stated *ante*, "we review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order." (*In re A.M.* (2020) 47 Cal.App.5th 303, 314.)

2.    *ANALYSIS*

Mother contends that "Father and several paternal relatives indicated Cherokee and Blackfoot/Blackfeet ancestry. [Citations.]  However, the record fails to show that the Department conducted adequate and proper further inquiry and due diligence in contacting the Blackfeet Tribe because it failed to adequately document its efforts to do so."

In this case, the Department interviewed Father, known paternal family members, and others to obtain information regarding Minor's possible Indian ancestry.  With this information, the Department contacted the BIA on three separate occasions—August 28, 2023, February 15, 2023, and May 31, 2023—requesting assistance.  Additionally, the Department contacted the Blackfeet Tribe formally and informally with the information gathered to share information and assist the tribe in making a membership or eligibility determination.

In an ICWA declaration of due diligence filed on October 4, 2019, the Department provided that a notice to the Blackfeet Tribe of Montana was sent on August 28, 2019.  A proof of service green card receipt was signed by the tribe on September 19, 2019, and received by the Department on September 25, 2019.  Thereafter, in a letter dated October 23, 2019, the Blackfeet Tribe of Montana provided that Minor was not an enrolled member nor eligible for membership in the Blackfeet tribe.

12

On March 15, 2023, the Department filed a status review report. The social worker "emailed BIA on 02/15/2023 with the names of the child and family members and informed them that certified letters of informal noticing were sent to the . . . Blackfoot tribes." Moreover, the social worker "informally noticed [the] Blackfoot tribes on 02/21/2023 as certified letter[s] were mailed out.

The Department filed an additional information to the court on June 15, 2023, as "an update to the court regarding ICWA." The social worker stated on June 1, 2023, "the undersigned mailed certified letters to [the] Blackfoot tribe[] with names of family members." The social worker also sent an email to the BIA on May 31, 2023. The list of paternal family members included Minor, Mother, Father, paternal aunt B.J., paternal grandfather A.B., paternal grandmother Y.B. and paternal great-grandmother W.B. This letter, however, did not include the mailing address for the Blackfoot tribe.

Mother contends that the Department failed to comply with the further inquiry requirement because "almost three years time passed from when the juvenile court initially conducted further inquiry in August 2019 . . . to May 30, 2023, when it sent updated further inquiry letters to the relevant tribes and the BIA," and "the Department failed to record the addresses where it sent the May 30, 2023 further inquiry letters to."

In support of her argument, Mother relies on *In re E.C.* (2022) 85 Cal.App.5th 123 (*E.C.*). Mother claims that in *E.C.*, the appellate court "found that the juvenile court committed prejudicial error where the record contained no documentation regarding to whom the Department may have directed further inquiries."

In *E.C.*, the record "contain[ed] no documentation regarding to whom the Department may have directed ICWA inquiries and what responses, if any, were received." (*E.C.*, *supra*, 85 Cal.App.5th at p. 147.) Therefore, the court agreed with the mother that "the juvenile court's finding that ICWA did not apply was not supported by substantial evidence and the court abused its discretion in concluding otherwise." (*Id.* at pp. 147-148.)

The facts in this case are distinguishable from the facts in *E.C.*, *supra*. Here, the Department contacted the Blackfeet tribe in 2019 and received the green return receipt from the Blackfeet tribe. Thereafter, the Department again contacted the tribe on May 30, 2023. Although this letter did not provide the mailing address for the tribe, the omission of a mailing address does not create the reasonable conclusion the tribe was not noticed. Because the Department sent the 2019 notice to the proper address, we can reasonably infer that the 2023 notice was also sent to the proper address. Moreover, unlike the facts in *E.C.*, which contained "no documentation" regarding to whom the department directed ICWA inquiries, the record here clearly shows that the Blackfeet tribe was notified. Additionally, the record contains numerous documents regarding the Department's inquiries sent to the BIA and various Indian tribes on behalf of Minor, unlike *E.C.*'s record, which, again, contained "no documentation."

The Department's further inquiry obligation is " 'not an absolute duty to ascertain or refute Native American ancestry.' " (*In re Dominic F.* (2020) 55 Cal.App.5th 558, 570.) Instead, it is a duty that the department make "a good faith effort to gather information about the children's membership status or eligibility." (*Ibid.*) Hence, the

absence of the Blackfeet tribe's address in the letter sent in May 2023 and the lack of a response letter from the tribe, although helpful for verification purposes, do not per se preclude a finding that the Department fulfilled its duty of further inquiry. Substantial evidence includes all reasonable inferences that can be drawn from the evidence (*In re R.T* (2017) 3 Cal.5th 622, 633), and "[w]e must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them." (*In re A.M.* (2020) 47 Cal.App.5th 303, 314.) The juvenile court's finding that ICWA did not apply is supported by substantial evidence.

## DISPOSITION

The juvenile court's findings and orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

Acting P. J.

I concur:

MENETREZ

J.

15

RAPHAEL, J., dissenting.

I would conditionally affirm the order terminating parental rights and order San Bernardino County Children and Family Services to complete the initial inquiry of the mother's extended family as to whether they have any information that C.B. may be Indian. (See Welf. & Inst. Code § 224.2, subd. (b).)

Mother first appeared in court on July 24, 2023, and the court questioned her as the Indian Child and Welfare Act requires. (Maj. opn., *ante*, at p. 6.) On that day, mother provided the names and phone numbers of an uncle and another relative. The majority opinion adopts the view that inquiry of mother's extended family would be required if C.B. was removed from her home without a warrant, but it is not required because C.B. was removed with a warrant. That means that the Department had no duty to inquire of extended family because—nearly four years earlier on August 21, 2019, a few days before her detention hearing—C.B. was removed by warrant.

The method by which C.B. was removed from her home bears no connection to the initial inquiry into whether she is an Indian child.[1] Unlike the majority, I agree with the opinions from this division and four others holding that the initial inquiry duty is the same whether or not a warrant is used to remove a child. (See *In re Delila D.* (2023) 93

---

[1] A removal warrant contains no requirement bearing on inquiry into whether a child has Native American background. When the warrant was executed, the mother's whereabouts were unknown so the social worker was unable to inquire into whether she had Native American ancestry. The social worker also was unable to inquire of the father because he "was not receiving the detention warrant . . . well."

1

Cal.App.5th 953; *In re Samantha F*. (2024) 99 Cal.App.5th 1062; *In re C.L.* (2023) 96 Cal.App.5th 377; *In re Jerry R.* (2023) 95 Cal.App.5th 388; *In re V.C.* (2023) 95 Cal.App.5th 251; *In re L.B.* (2023) 98 Cal.App.5th 512; see also Cal. Rules of Court, rule 5.481(a)(1) [no reference to warrants in requiring that party seeking foster-care placement or termination of parental rights must ask extended family whether the child may be Indian]; Department of Social Services Regulations 31-001.21 [the "requirements for inquiry into whether a child is an Indian child . . . apply to all children placed in out-of-home care"]).  The Department here does not argue that its lack of compliance was harmless if it had a duty to inquire of extended family.  (See *In re Benjamin M*. (2021) 70 Cal.App.5th 735, 742.)

I agree with the majority's determination that the Department's further inquiry of father's side was adequate.  I respectfully dissent because my disposition of the appeal would differ from that of the majority.

RAPHAEL      

J.
